VERMONT SUPREME COURT
109 State Street
Montpelier VT 05609-0801
802-828-4774
www.vermontjudiciary.org



Case No.      24-AP-048

*Note: In the case title, an asterisk (\*) indicates an appellant and a double asterisk (\*\*) indicates a cross-appellant. Decisions of a three-justice panel are not to be considered as precedent before any tribunal.*

## ENTRY ORDER

OCTOBER TERM,   2024

Carl LaShomb v. Willy Jane Patry*      }    APPEALED FROM:
         }    Superior Court, Washington Unit,
         }    Family Division
         }    CASE NO. 23-DM-01332
            Trial Judge: Kirstin Schoonover

In the above-entitled cause, the Clerk will enter:

Mother appeals the family division's award of primary legal and physical parental rights and responsibilities for the parties' daughter to father. We affirm.

Mother and father have one daughter, who is fifteen years old. Father filed this parentage action in April 2023. The court held a final hearing in November 2023, after which it issued an order containing the following findings. Mother and father coparented effectively for most of daughter's life. For much of 2010, mother was deployed in Afghanistan and father served as the primary care provider. When mother returned in 2011, the parties spent equal time caring for daughter. The parties gradually adjusted the schedule so that by the time daughter turned five, she lived with mother on weekdays and father on weekends. They shared summers equally. During this time mother lived in Bethel and father lived in Fairfax. In the summer of 2021, father cared for daughter most of the time while mother studied for the bar exam and underwent military training.

In the fall of 2022, daughter began eighth grade at a private high school in South Burlington. Father thought the public school in his area would be a better fit because it would avoid the expense of private school and a long commute to South Burlington from Barre, where mother had recently moved. Mother believed private school would be better for daughter. Father agreed to try it for one year to see how daughter fared. Daughter generally did well in eighth grade. She made friends and qualified for the varsity volleyball team.

In April 2023, father moved to upstate New York to live with his fiancée. Father is a self-employed arborist with a flexible schedule. During his time with daughter on the weekends,

the family is home by 7:30 or 8:00 p.m., daughter is in her room by 9:30, and all electronics are placed on the kitchen counter by 10:00. Daughter has her own room and does chores such as feeding the chickens, cooking, and laundry. Daughter has a good relationship with father and his fiancée.

After father moved to New York, daughter asked to live with him and attend school in New York. Father indicated that if granted custody, he would enroll daughter at the public school near his home. If daughter struggled in New York or wished to return to Vermont to complete high school, he would honor that request. Mother wanted daughter to stay at her private school, which mother believed would better prepare her for college. Mother believed daughter was simply in a rebellious phase and would fare better if she stayed in her current school.

At the time of the final hearing, daughter was attending ninth grade at the private school in South Burlington. Daughter refused to attend classes at the beginning of the school year until mother offered to have her stay with her maternal aunt and uncle in Fairfax. Aunt and uncle drove daughter to school in the mornings. During the school week, mother took daughter out to lunch almost daily. Mother picked daughter up after school and they would decide each day whether daughter spent the night in Fairfax or with mother in Barre. Daughter stayed with mother about half of the time.

The court found that both parents had an active and loving relationship with daughter. Each parent acknowledged that the other was a good parent but expressed concerns about the other's judgment. Mother testified that when daughter was young, father left inappropriate magazines where daughter could find them. Later, after father agreed that daughter's relationship with a boyfriend should end, mother discovered that father had driven daughter to the boyfriend's house to deliver a present. In 2019, father had an employee who was listed on the sex-offender registry. Father was not concerned about his presence around daughter because the offense had taken place thirty years earlier, but he fired the employee at mother's insistence. For his part, father expressed concern about mother's long-term relationship with a man who in 2018 was diagnosed with dissociative identity disorder. Daughter did not like mother's partner, but mother continued to allow him to reside in the home. In February 2022, mother discovered a camera in the home and immediately reported her partner to the police. He was subsequently charged with voyeurism.

Daughter testified that she loved both parents. She wanted to live with father in New York and try a new school. She enjoyed the routine at father's house and felt mother did not listen to her. She expressed confusion about where she would be staying when in mother's care. She felt supported and safe with father and enjoyed her relationship with his fiancée.

The court found that parents were equally situated with regard to most of the statutory factors. It found that daughter had many connections to Vermont. She made friends at her high school but had pulled away from that community out of a strong desire to attend school in New York. She was comfortable at father's home and enjoyed the consistency and routine there. The court found that mother, wanting to please daughter and persuade her to attend the private school, had created a situation where daughter bounced between two homes on weekdays. The court found that "[t]his has created a less safe environment for [daughter], as she does not have a

stable and consistent home to return to on a daily basis." The court found that mother firmly believed daughter should attend private school, while father felt she should attend the school of her choice. The court concluded that father was better able to meet daughter's present and future developmental needs and therefore awarded him primary parental rights and responsibilities. Mother appealed to this Court.

On appeal, mother challenges certain factual findings as clearly erroneous. Mother also argues that the court failed to adequately explain how it weighed the best-interests factors and did not give sufficient weight to mother's role as primary caregiver. "The trial court has broad discretion in a custody matter, and we must affirm unless the discretion is erroneously exercised, or was exercised upon unfounded considerations or to an extent clearly unreasonable in light of the evidence." Myott v. Myott, 149 Vt. 573, 578 (1988) (quotation omitted). "We will uphold factual findings if supported by credible evidence, and the court's conclusions will stand if the factual findings support them." Spaulding v. Butler, 172 Vt. 467, 475 (2001) (quotation omitted).

Mother first argues that the court erred in finding that mother created a "less safe environment" for daughter by allowing her to stay with her aunt and uncle during the school week. Mother asserts that there was no evidence that aunt and uncle's home was unsafe. However, mother misconstrues the court's finding. It is clear from the context that the court was referring to the lack of routine and uncertainty of the arrangement mother had created, and was not making a statement about aunt and uncle or their home. Viewed in this light, the finding, though perhaps clumsily worded, is supported by the record and is not clearly erroneous. Mother testified that daughter's schedule was inconsistent from week to week and that daughter did not know each day where she would sleep that night. She testified that she expected daughter would spend more time with her eventually but did not indicate how long the arrangement would continue. Daughter testified that she did not usually know where she was staying the night and that she wanted the stability that her father's care provided. She stated that with her father, "I have a kind of a routine that I really appreciate." This testimony supports the court's finding that the arrangement during the school week was less "safe," in the sense of being unstable and inconsistent, for daughter.

Mother further challenges the court's finding that "[f]actor 9 is not at issue," arguing that father allowed daughter to spend unsupervised time with a registered sex offender. The court was referring to the ninth of the factors that the court must consider in awarding parental rights and responsibilities, which is "evidence of abuse, as defined in section 1101 of this title, and the impact of the abuse on the child and on the relationship between the child and the abusing parent." 15 V.S.A. § 665(b)(9). Section 1101 defines abuse to include child abuse as defined in 33 V.S.A. § 4912(1), which states that an abused child is "a child whose physical health, psychological growth and development, or welfare is harmed or is at substantial risk of harm by the acts or omissions of his or her parent or other person responsible for the child's welfare." "Risk of harm" is, in turn, defined as "a significant danger that a child will suffer serious harm by other than accidental means, which harm would be likely to cause physical injury, or sexual abuse, including as the result of . . . a registered sex offender . . . spending unsupervised time with a child." 33 V.S.A. § 4912(14). Mother argues that father abused daughter by placing her at risk of sexual harm under the above definition.

The court's finding is not clearly erroneous. Father testified that the individual in question began working for him in 2019. When mother informed father that the individual was a registered sex offender, father responded that the offense had occurred thirty years earlier. However, father decided to fire the individual so that he would no longer be around daughter or father. Mother admitted that the same individual rented a home from her and did work on her house. Daughter was occasionally alone in his presence in mother's house and would sometimes ride with him to mother's house from father's house. At the time, mother had no reason to believe the individual was unsafe, as he did not disclose to mother that he was a sex offender. When asked if father's decision to fire the individual so that he wouldn't be around daughter was "good enough," she said it was "okay" because the important thing was that the individual was not around daughter. This testimony evidently did not persuade the court that daughter was at "substantial risk of harm" such that a finding of abuse was warranted. The court was within its discretion to make this determination based on the evidence presented. See In re M.L., 2010 VT 5, ¶ 29, 187 Vt. 291 ("[I]t is the exclusive role of the family court to weigh the evidence and assess the credibility of witnesses.").

Mother next argues that the court failed to adequately explain how it weighed the best-interests factors. We disagree. Section 665(b) states that in making an order concerning parental rights and responsibilities, "the court shall be guided by the best interests of the child and shall consider at least" the nine factors enumerated. As we have explained, however, the statute "imposes no specific requirement on how this consideration is to be manifested in the court's findings and conclusions." Mansfield v. Mansfield, 167 Vt. 606, 607 (1998) (mem.). Here, the court explained that it considered all the relevant statutory factors and found that parents were equally situated with regard to most of them.[*] The court based its decision on the third factor, which was "the ability and disposition of each parent to meet the child's present and future developmental needs." 15 V.S.A. § 665(b)(3). It found that this factor weighed in favor of father, who provided routine and stability for daughter and was supportive of daughter's desire to try a different school. The court's findings are sufficient to explain its decision.

Finally, mother argues that she was the current primary caregiver and that the court should have given this factor greater weight in its analysis. The court did not find that mother was the primary caregiver; it instead found that each parent had been the primary caregiver at different points in daughter's life. This finding is supported by the record. However, even assuming that mother was currently serving in that role, it would not require the court to automatically award her custody. "Although a primary care provider finding is entitled to great weight, this does not create a rule that the primary custodian will be awarded custody as long as the parent is fit." Habecker v. Giard, 2003 VT 18, ¶ 14, 175 Vt. 489 (mem.) (quotation omitted). "Instead, the weight accorded to the primary care provider factor depends upon the quality of the relationship between the child and custodian, as well as the likely effect that a change of custodian will have on the child." Id. Here, the court found that father and daughter had a loving and strong relationship, daughter enjoyed living with father and appreciated the routine he created, and father had served as primary caregiver at various points in daughter's life, including

---

[*] The eighth factor was not relevant because parents did not agree to share custody, and as explained above, the court found that the ninth factor was not relevant because there was no evidence of abuse.

4

the summer of 2021. The court considered the appropriate factors and did not abuse its discretion in concluding that an award of custody to father was in daughter's best interests.

Affirmed.

BY THE COURT:

---

Paul L. Reiber, Chief Justice

---

William D. Cohen, Associate Justice

---

Nancy J. Waples, Associate Justice